OSTROW ELECTRICAL CO. *vs.* J.L. MARSHALL & SONS, INC., & others[1]; CITY of WORCESTER, third-party defendant; PERRY DEAN ROGERS & PARTNERS: ARCHITECTS, fourth-party defendant.

No. 01-P-1487.

Suffolk. March 18, 2003. - November 5, 2003.

Present: DOERFER, McHUGH, & KAFKER, JJ.

*Contract,* Public works, Construction of contract, Construction contract, Architectural services. *Architect. Public Works,* Specifications. *Consumer Protection Act,* Bad faith.

In a construction contract dispute regarding which subcontractor was required to supply and install backboxes to house loudspeakers at a convention center, a Superior Court judge properly determined that the decision of the architect to whom the dispute was submitted (pursuant to relevant contractual terms) that the plaintiff was responsible for the duty in question was final, as his decision was neither arbitrary nor capricious nor legally erroneous for purposes of G. L. c. 30, § 39J. [820-823]

A Superior Court judge in a civil action correctly *denied a motion for summary judgment* brought by the plaintiff, an audiovisual subcontractor performing construction work at a convention center, on a claim under G. L. c. 93A, § 11, against the project architect who resolved a dispute regarding the relative obligations of the plaintiff subcontractor and an electrical subcontractor against the plaintiff, where the architect's resolution of the conflict could not, as a matter of law, support an inference of bad faith. [823-824]

CIVIL ACTION commenced in the Superior Court Department on August 13, 1998.

The case was heard by *Herman J. Smith, Jr.,* J., on motions for summary judgment; judgment was entered by *Judith Fabricant,* J., and damages, costs, and fees were determined by her.

*Sally A. Corwin (Carolyn M. Francisco* with her) for the plaintiff.

*Jeffrey L. Alitz* for Michael D. Waters & another.

*James F. Grosso* for J.L. Marshall & Sons, Inc.

---

[1]St. Paul Fire and Marine Insurance Company and Michael D. Waters.

*Donald V. Rider, Jr.*, Assistant City Solicitor, for city of Worcester.

DOERFER, J. The Worcester Convention Center is equipped with an elaborate audiovisual system that includes numerous loudspeakers. Associated with most of these loudspeakers is a "backbox" that houses the loudspeaker and into which wires run. A controversy developed during construction between Ostrow Electrical Co. (Ostrow), the audiovisual subcontractor, and Coughlin Electric Company, Inc. (Coughlin), the electrical subcontractor, about who was responsible for supplying and installing these backboxes. Coughlin is not a party to this litigation. Pursuant to the relevant terms of the general construction contract and subcontracts, the dispute was submitted to the architect, Perry Dean Rogers & Partners: Architects (Perry Dean). Michael D. Waters (Waters) is the architect employed by Perry Dean who took on the task of resolving the dispute. Waters determined that the responsibility belonged to Ostrow. Ostrow did the work under protest and brought a claim against Waters under G. L. c. 93A, § 11, alleging that Waters had acted in bad faith. Ostrow also sought to recover the cost of this work as a back charge against the general contractor, J.L. Marshall & Sons, Inc. (Marshall), and St. Paul Fire and Marine Insurance Company, the surety for Marshall. Marshall brought a third-party complaint seeking indemnification from the city of Worcester (city); the city in turn brought a fourth-party complaint seeking indemnification from Perry Dean.[2]

A judge of the Superior Court granted Waters's motion for summary judgment on the G. L. c. 93A, § 11, claim and Ostrow's motion for summary judgment against Marshall and its surety on the back charge. The judge also denied Marshall's motion for summary judgment on its third-party complaint against the city for indemnification.[3] A second judge entered judgment on those claims and determined the damages, costs, and fees owed Ostrow by Marshall. All rulings are before us on appeal or cross appeal by the parties adversely affected thereby.

---

[2]Ostrow also brought a cross claim against Perry Dean for any sums Waters was unable to pay.

[3]The city's fourth-party complaint against Perry Dean was dismissed without prejudice as the third-party complaint had been dismissed on the merits.

1. *Background.* As is usual in large public contracts, the work to be done by various subcontractors was specified in numbered sections of the specifications. Subcontractors were invited to file bids on the work to be done. These filed subbids were reviewed and the subcontracts awarded based upon an evaluation of each subbid by the awarding authority.

Each subcontractor was issued a set of the documents relevant to its bid, including drawings, specifications, and addenda. Prior to and during the bidding process, the original documents were subject to addenda, and each subcontractor was responsible for reviewing all addenda to make sure it knew what it was bidding on.

Section 17100 of the specifications dealt with the work to be done by the audiovisual contractor, Ostrow. Under "General Requirements," paragraph E states:

> "Provide materials, labor, equipment and services necessary to furnish, deliver and install all work of this section as shown on the drawings, as specified herein and/or required by job conditions."

Paragraph F states:

> "The work shall include, but is not limited to, the supply and installation audiovisual [*sic*] systems as specified herein and shown on drawings."

Section 2.05 "Specific Detail Capabilities," provides, inter alia:

> "K. Loudspeaker Systems
>
> > 3. Schedule of Loudspeaker Types by Area
> >
> > > S1. 12" Ceiling Speaker with co-axial horn and compression driver. . . . *Complete with backbox, baffle/grille.*
> > >
> > > S2. 6.5" Ceiling Speaker. . . . *Complete with backbox, baffle/grille.*
> > >
> > > S3. 4" Ceiling speaker. . . . *Complete with backbox, baffle/grille."*

(Emphasis supplied.) Also listed under par. K.3 was another

weatherproof speaker, S4, for use at the loading docks and entrance canopy, which did not utilize a backbox. Section 17100 also contained the following paragraph:

"1.01 Work Specified Elsewhere.

> A. All conduits, wireways, connection boxes, pull boxes, junction boxes, and *outlet boxes permanently installed in walls, floors, and ceilings, provided under applicable electrical sections*" (emphasis supplied).

Section 16000 of the specifications dealt with the work to be done by the electrical subcontractor, Coughlin. The electrical drawing, E15, contained a note stating that "the electrical contractor shall provide . . . [the] speaker backboxes." The word "provide" was defined in section 4.4.1 of the general conditions of the contract as meaning "furnish and install complete . . . unless otherwise specified." As amended by addendum 7,[4] section 16000 also gave responsibility to the electrical subcontractor for "outlet boxes" by cross-referencing section 1.01, "Work Specified Elsewhere," in section 17100, the audiovisual specifications.

Thus, a conflict existed between the requirement in the audiovisual specification that Ostrow supply and install the listed speaker, type S1, S2, and S3, complete with backboxes, and the statement in drawing E15 that the electrical subcontractor was to provide the backboxes. Also unclear was the import of the assignment of "outlet boxes" to the electrical contractor, as set forth in addendum 7, while the audiovisual specifications assigned speaker "backboxes" to the audiovisual subcontractor.

The contract provided for the resolution of disputes of this kind as follows:

"2.2.7 The Architect will be the interpreter of the require-

---

[4]Addendum 7 was an addendum to the electrical specifications. It added a paragraph 19 to page 16000-3, par. 1.02 A, providing, "Audiovisual Systems per 17000-2 1.01 A & B." See "1.01 Work Specified Elsewhere," *supra.* Thus, section 1.01 A added to the electrical subcontract what had been excluded from the audiovisual contract.

Section B referred to "electrical breaker panels" required to power audiovisual systems.

ments of the Contract Documents and the judge of the performance thereunder by both the Owner and Contractor.

"2.2.8 The Architect will render interpretations necessary for the proper execution or progress of the work, with reasonable promptness and in accordance with M.G.L. c. 30, section 39P, or any lesser time limit agreed upon. Either party to the Contract may make written request to the Architect for such interpretations.

"2.2.9 Claims, disputes and other matters in question between the Contractor and the Owner [or subcontractor and contractor] relating to the execution of [sic] progress of the Work or the interpretation of the Contract Documents shall be referred initially to the Architect for decision which he will render in writing within a reasonable time.

"2.2.10 All interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. In his capacity of interpreter and judge he will endeavor to secure faithful performance by both the Owner and the Contractor, will not show partiality to either, and will not be liable for the result of any interpretation or decision rendered in good faith, and in the absence of negligence, in such capacity."

2. *Discussion.* (a) *Error in resolving the dispute.* As noted above, the dispute was submitted to Waters for resolution. General Laws c. 30, § 39J, as inserted by St. 1961, c. 538, § 1, prevents a decision made by an architect from being "final" or "conclusive" "if such decision is made . . . capriciously, or arbitrarily[,] is unsupported by substantial evidence, or is based upon error of law."[5] Ostrow argues that Waters's decision had

---

[5]There is no merit to Waters's argument that the parties expressly agreed in the contract that the decision of the architect on such matters was binding so long as the architect acted in good faith. This is, in effect, an argument that G. L. c. 30, § 39J, does not operate where, as here, there is an express clause giving the architect authority to resolve disputes which does not contain the limitation relating to errors of law found in the statute. However, the statute itself specifically provides, "[n]otwithstanding any contrary provision of any

no rational basis and thus was arbitrary and capricious and constitutes an error of law.

Waters took the position in resolving this controversy that specification 17100 for audiovisual work explicitly required Ostrow to furnish "backboxes" and that the references to "outlet boxes" in addendum 7 to the electrical specifications did not shift the backbox work from Ostrow to the electrical subcontractor. As for the direct references in electrical drawing E15 to backboxes, Waters took the position that such references were superceded by the language in the specifications. He relied on the order of priority of documents as specified in the contract: Section 1.1.1 of the General Conditions states:

> "In the event of any conflict among the Contract Documents, the Documents shall be construed according to the following priorities: Highest Priority — Modifications, Second Priority — Agreement, Third Priority — Addenda-later date to take precedence, Fourth Priority — Special Requirements, Fifth Priority — Special Conditions, Sixth Priority — Supplementary General Conditions, Seventh Priority — General Conditions, Eighth Priority — Specifications, Ninth Priority — Drawings."

Waters reasoned that Ostrow's duties to provide backboxes was provided for in the specifications, whereas the electrical subcontractor's duties to provide the backboxes were specified only in the drawings. Since specifications take precedence over drawings, Waters determined that the obligation for backboxes fell to Ostrow.

Ostrow argues that the language in the drawings was put there in connection with addenda 4 and 7, and addenda take precedence over specifications. As to addendum 4,[6] Waters argues that it merely reduced the number of drawings that the

---

contract," and thus the terms of the contract cannot undermine the requirements of the statute.

[6]Addendum 4 changed par. E in "Part 1-General 1.00 Filed Sub-Bid Requirements" of the electrical specification from "Work in this Section is shown on all drawings (general, civil, landscape, architectural, structural, fire protection, plumbing, HVAC/mechanical, electrical) shown on Cover Sheet" to "Work in this section is shown on Electrical, Audio Visual and Food Service drawings as listed on sheet G 1 of the drawings. All other drawings; Civil, Architectural, Structural, Fire Protection, Plumbing and

electrical subcontractor needed to look at to find out what its work was. Addendum 4 did not address what the work of the audiovisual subcontractor was supposed to be. Waters argues that, by issuing an addendum that referred to a drawing relating to electrical work, the relative priority of those drawings was not increased to trump a provision of the audiovisual specification telling the audiovisual subcontractor what work was required of it. We cannot say that Waters's determination was incorrect as matter of law or that it was arbitrary and capricious. His decision is therefore final. See G. L. c. 30, § 39J.

As to the terms of addendum 7, Ostrow submitted an affidavit referencing addendum 7's exclusion of "outlet boxes" from work to be done by the audiovisual subcontractor, and averred, "I knew from my experience and the Mass. Electric Code that [the] term ["outlet boxes"] includes speaker backboxes." The "General Conditions" of the contract provide, "Words and abbreviations which have well-known technical or trade meanings are used in the Contract Documents in accordance with such recognized meanings." Ostrow, however, did not submit a copy of the electric code.

Waters concluded that, because addendum 7 did not specifically exclude speaker backboxes, there was no conflict between the requirement in section 17100 that the audiovisual subcontractor provide speaker backboxes, and the addendum's assignment of outlet boxes to the electrical subcontractor. Waters disputes the contention that the specific term "backboxes" is equivalent to the generic term "outlet boxes." While Waters does not dispute that outlet boxes can "include" speaker backboxes, as Ostrow averred (speaker backboxes being a particular type of outlet box), Waters argues that, since the audiovisual specification explicitly includes in Ostrow's responsibility the provision of speaker backboxes while at the same time specifically excluding from Ostrow's work the responsibility to provide "outlet boxes," the two terms cannot mean the same thing. We conclude that Waters's decision was plausible and cannot be characterized as having no rational basis. The decision, therefore, was not arbitrary and capricious, and there was no error of law.

HVAC/Mechanical are to be referenced for information and coordination with regards to installation of all electrical work."

Neither did the architect, as Ostrow argues, make a new contract by interpreting the ambiguities in the contract. "Contract terms are not changed when the architect decides in the course of a job what a specification means or whether one specification trumps another." *Fontaine Bros.* v. *Springfield*, 35 Mass. App. Ct. 155, 159 (1993). Compare *Perini Corp.* v. *Massachusetts Port Authy.*, 2 Mass. App. Ct. 34, 42-44 (1974); *Acmat Corp.* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. 44, 49 (1983). Contrast *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 800 (1986) (where the contract did not state that the architect's decision was final as between the parties, the judge could decide issues of contract interpretation at trial).

(b) *Bad faith claim against the architect.* Ostrow's claim for summary judgment under G. L. c. 93A, § 11, is based on an argument that, on these facts, Waters acted in bad faith as a matter of law. Waters's cross motion for summary judgment reasons that the facts show that he at least made a reasonable judgment as to the relative obligations of the electrical and audiovisual subcontractors which cannot form the basis of liability under G. L. c. 93A, § 11. Ostrow's arguments are overdrawn and were properly rejected by the motion judge. The foregoing discussion shows that there was a severe ambiguity, one might say contradiction, in the contract documents as to who was responsible for the speaker backboxes.[7] Waters's resolution of that conflict cannot, as a matter of law, support an inference of bad faith. Compare *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 505 (1997). Contrast *Nota Constr. Corp.* v. *Keyes Assocs.*, 45 Mass App. Ct. 15, 21-22 (1998).

Other evidence in the summary judgment record shows that Waters consulted others in an attempt to resolve the issue rationally. In addition to reviewing the contract documents, the

[7]Indeed, the problem of which subcontractor was required by the contract to furnish the backboxes seems severe enough to have alerted the parties to resolve it before submitting a bid. All of the ambiguities that gave rise to this litigation were readily apparent in the documents upon which the subcontractors submitted their bids. As provided for in section 3 of the instructions to bidders, any subcontractor had the right to submit questions and receive clarifications of questions raised by the plans, specifications, and other contract documents before submitting a bid. Compare *Fontaine Bros.* v. *Springfield*, 35 Mass. App. Ct. at 157.

record shows that Waters discussed this matter with Gilbane, the construction manager, the drafters of the specifications, and another architect at Perry Dean.

The motion judge did not err in denying Ostrow's motion and allowing Waters's motion for summary judgment on Ostrow's c. 93A claim.

*Conclusion.* Because we conclude that Waters did not err in construing the contract, the judgment for Ostrow on its claim against Marshall and St. Paul Fire and Marine Insurance Company cannot stand, and Marshall's third-party complaint against the city of Worcester is therefore moot. Accordingly, the judgment is affirmed as to the c. 93A claim and the dismissal of Marshall's third-party complaint against the city of Worcester. The judgment is reversed as to the award to Ostrow on its claim against Marshall and St. Paul Fire and Marine Insurance Company.

*So ordered.*